Mr. Wright, this is an interlocutory appeal of the denial of motions to compel arbitration. The case raises many of the same issues the court tackled in the Baysmore v. Jefferson Capital Systems case. Specifically, the court is tasked with addressing the competence of declaration testimony that's being used to establish a click-wrap agreement and the mailing of a credit account agreement, both of which contained arbitration clauses. Unlike in Baysmore where the agreement and what the terms of the agreement were, here the declarations are competent evidence. The Winship Declaration establishes a click-wrap agreement, Mr. Mason, and the Naaman Declaration establishes that Sincrety mailed an account agreement to Burnett who accepted the terms by using the credit. Let's start with the, if you don't mind, Mason issue. On the Mason issue, let me tell you what my concerns are and you can address them. The first concern is that the declaration says, in substantially similar form, it does not say that that is what was signed. The second problem is even if that weren't the case, the part that the declaration cites to, which is step four, review terms and conditions and apply, does not say anything about arbitration. My third problem is that what's attached is cut off on the second page, so I don't see how that's a true and correct copy of what was signed. I don't know if you want to tackle those, but those are my concerns with the Mason, the alleged Mason agreement. Okay, so to address the first issue as far as it being in substantially similar form, my reading of Bazemore's discussion of attachment of documentary evidence is that it is to substantiate testimony, corroborate, perhaps maybe another way of putting it. We have testimony from Winship that describes how this application process works. But why say in substantially the same form? Why not just say in the same form? Well, I can't speak necessarily for Mr. Winship. It's possible that it's substantially similar because of the parameters of a computer display may make the argument. Or it's possible that there were nine prerequisites and they only satisfied seven of them. That's substantial, or eight of them, eight and a half. Substantial, but it still wouldn't cut it. Well, let's look at the text of Bazemore. Well, isn't it true that we're talking about two different documents? The substantially similar refers to the application form, but on the same page of the screen, he says, there's the agreement. Yes. Agreement is what contains all of the arbitration language, and a true and correct copy of that is attached, he says. Yes, Judge Benson, that sort of ties in, I think. We're talking about two different things. Bazemore talks about the agreement not being the same. Here we're talking about the application not being the same, but it has nothing to do with the actual arbitration language, which is in the agreement, which a true and correct copy is attached to be a part of it, he says. Judge Benson, I agree it is important not to conflate application with agreement here. Winship's testimony is that the agreement attached to his declaration is the agreement. In Bazemore, when it was talking about the actual agreement, the court said that things like the actual agreement would seem to be enough. Also, an agreement that contained identical terms would be- Bazemore said the agreement, not the application. I agree, Judge Benson, but if attaching an identical, an agreement that contains identical terms or even, to quote from the opinion, a, quote, relevant variant of that agreement is enough for the agreement, it seems like it would have to be enough for an application whose function here is to substantiate Winship's clear testimony as to how the application process worked online. What is the language from the declaration that you rely on that shows that Mason understood, that Mason received a copy of the actual terms and conditions relating to arbitration? Because it looks to me like the part that is cited doesn't mention arbitration. Maybe I'm reading it wrong. Well, in period 11 of Winship's declaration, he says that Mason could not have opened a credit account without clicking, yes, I accept these terms, verifying he accepted the terms and conditions, quote, a true and correct copy of the applicable Web Bank Fingerhut credit account agreement, account agreement governing the account at the time Mason completed the online application is attached as Exhibit C. Except that it's not, right? I mean, it cuts off in the second page. No, there are two pages. If you compare it to the account agreement that is in Exhibit D. It's Exhibit C is what we're talking about, right? Agreed, Your Honor, but the account agreement attached as Exhibit C is consistent. The other thing I would say to that question, Judge Rosenbaum, is it may cut off, but it  is still there. Perhaps that might raise an inference that there's something there in the agreement that's contradictory. But if that were to be the case, it seems like this is an issue that should be bound for a Section 4 trial instead of denial of a motion to compel arbitration. There would be, this is still at least some competent evidence that's not, it's more than a scintilla that Mason agreed to arbitrate this through a CLICRAP agreement. A trial being a summary trial in front of the district court? That's correct, Your Honor. Where did y'all on the record ask for that? It's right in the statute, Your Honor. Now, where did you ask the district court? Before we put a district court in error and reverse them and say, you did bad, now go back and do it right, we generally require that the party who's pressing the alleged error have asked the district court to do what it's asking us to reverse the district court for not doing. Your Honor, I'm not sure that the party would have to ask for that here. In Baysmore, the court compares a motion to compel arbitration to a motion for summary trial. I take your answer to be there's nowhere in this record that we even hinted to the district court that it should do that. I'm not aware of one, Your Honor. I will look at the record and if there is one, I'll supplement under 28J. But again, I'm not sure that the party would have to, comparing it to a motion for summary judgment, if this isn't proceeding on the merits. Would you have to ask for it until this is finally resolved? This is an interlocutory appeal of the denial of the motion, so it's really not right to get to the asking, is it? I think that's correct, Judge Vinson. Just as if a party moves for summary judgment and loses, it's not going to have to ask for it. Although I took it you're asking us to tell the district court to give you a summary  That's correct. Even though it's premature to address the issue. Well, if the court, I think this court could conclude appropriately that it was inappropriate for the district court to deny the motion to compel arbitration outright, that issues of fact remain. It can't determine the issue and therefore the only way to resolve the making of the agreement is to set the issue for trial, a summary trial proceeding under 9 U.S.C. Section 4, Your Honor. What would the additional evidence be that the bench would hear? I don't know that there would be any additional evidence, Your Honor. Perhaps there could be. Perhaps the bench or you could clarify their declaration testimony. But he's found that construing the facts in the light most favorable to you, you don't win. No, Your Honor. He's concluded that construing the facts in the light most favorable to the non-movement That's correct. Or resisting arbitration. You're right. The trial judge here at a summary trial could resolve any inconsistencies in the evidence as he or she saw fit. Make credibility determinations and weighing determinations based on the Cole record. That's correct. Or could demand live testimony in doing so. I'm not sure I see the conflict in the testimony, what it would be. Certainly there are no affidavits conflicting. I mean, you make general statements and the response is that's not specific enough. You know, substantially. I agree, Your Honor. There is no conflicting evidence here. It simply is our evidence good enough. And the way I guess you could get to a section four trial is our evidence is substantial and competent, but it is not conclusive. A fact finder could draw an inference from that evidence. But of course, a summary judgment like proceeding, the fact finder is barred from drawing that inference. Or that there is testimony here that because of, as Resmaa mentioned, there might be a page missing from the contract here. Or perhaps an argument that the testimony is conclusory that a fact finder could accept but may not be required to accept. Those issues could be resolved through trial at section four. The Winship Declaration establishes a proper foundation to show that what agreement was attached. We have paragraph 11 of that declaration. Delivery through a description of the online application process. Let me ask, this was prepared after Bazemore was decided in 2016, right? The declarations were, Your Honor. Yes, I would assume. And that was prepared, I presume, with Bazemore conditions in mind. I would assume that. And I would presume it was prepared with some legal assistance, was it not? Well, these are third party declarations, Your Honor. So I can't speak to what Mr. Winship or Ms. Naiman, what conversations they might have had with counsel for their companies at that time. These are not declarations from my client. Well, let me cut down to the bottom. Everything that Bazemore said was missing, you have said is included here. That's correct, Your Honor. We have Bazemore ruled out arbitrating in those cases because it concluded there was no competent evidence because proper foundations weren't laid. No competent evidence that the agreement had been provided to Ms. Bazemore, that she had accepted it. And what the actual terms of the agreement for both Ms. Burnett and for Mr. Mason, that evidence is here. The Winship declaration establishes this CLICRAP agreement with Mr. Mason. And the Naiman declaration establishes mailing of a credit agreement to Ms. Burnett and establishes on April 11th and establishes that she continued to use the credit until May 28th of the same year, 47 days later, ample time for the agreement to have arrived. And under Utah law, that's sufficient to enforce an unsigned credit agreement. Is there something that says in the Winship declaration or in the attachments that the terms and conditions that were supposedly on the same page as the application are the same as the agreement? No, Your Honor. Isn't that a problem? It doesn't perfectly close the loop and say this is the... Why isn't that a problem? My time has expired. I'd ask to continue to answer the question. No, it doesn't. It isn't perfect in closing that loop. But these are the terms and conditions in effect. And they are the terms and conditions that displayed when you clicked on the hyperlink or that are displayed on the page through what appears to be a scroll box above. So I will agree with that. I don't know that that's... Why isn't that a problem? Well, I think at worst for me, it's certainly something you could infer from that statement, which again gets us back to if you could draw the inference, then we can win through a Section 4 trial. That's a genuine issue of fact. That's something that would have to be resolved by a fact finder. Second, I think that it is... There doesn't seem to be a credible inference the other way. Why wouldn't you just say it though? I mean, if the terms and conditions are exactly the same as the agreement, why wouldn't you just say or why wouldn't Mr. Winship just say he agreed to the terms and conditions which are precisely the same as the agreement? Why not attach a copy of both to show that? Well, Judge Rosenbaum, as I understand paragraph 11 of Winship's declaration, that is what Winship is saying or is at least trying to say. That he had to agree to the terms and conditions. These are the terms and conditions. That is my reading of paragraph 11. Now, it may not be perfectly clear, but I suspect that's what, when this declaration was drafted, that was what this paragraph was intended to mean. It maybe could have been stated more clearly than it is. But again, at worst for my client, I think that's an inference that you can draw from this statement. And therefore, since it could be drawn from this statement, I think the issue has to be set for trial. At minimum. I'm sorry, whoever has the floor above. Mr. Frank. Good morning. My name is Gregory Frank from the law firm of Frank LLP. I represent plaintiff appellees Mr. Mason and Ms. Barnett. I have a prepared speech, but I believe the court has already honed in on the relevant issues here. And I'd like to address them in brief. I'd like to talk about the mailbox issue at some point before you get into too much of the other. Can you do that? Certainly, Your Honor. Is there a specific concern that? Well, you seem to maintain that there are two mailbox issues. That Utah has a separate mailbox issue than the federal mailbox issue. No, sir, Your Honor. There seems to be some dispute about that. We believe that the facts in this case are quite clear. That these affidavits would fail in any court in the United States because they clearly fail the Bayes-Moore standard. I also have here a list of district and circuit court cases upon which. Talking about the mailbox rule or what's required to show the existence of an arbitration agreement. It fails under both, Your Honor. I believe that. But let's talk about mailbox rule. Yes, sir. Y'all disagree about what McCoy 2 means, but you both seem to accept the proposition that McCoy 2, the 2001 case, was about Utah's general mailbox rule. We do, Your Honor. But if you look at the opinion in that case, it's talking about what the insurance contract provided about its mailbox rule incorporated into a contract between the two parties in that case. That's different than what the mailbox rule would have been in Utah had there been no contractual agreement to it. Is it not? Your Honor, I would argue that these affidavits would fail any mailbox. I know that. You're saying don't worry about it. I win anyway. What I'm asking you is, wasn't McCoy 2 about a contractual mailbox rule that the two parties agreed to and therefore is not directly relevant to what the Utah mailbox rule is, regardless of whether you win or lose under it? I believe that there is a, I'm sorry, Your Honor, if you could rephrase the question. Y'all both accept as a premise that McCoy 2, the big Utah Supreme, or the most recent Utah Supreme Court decision, states a rule about the Utah mailbox rule. And my question to you is, if you read the case, isn't it in fact stating the rule that the parties agreed to for purposes of that one contract? An insurance contract. They all have them. Not all of them, but most if you read it. I do understand what the court is saying, that in the facts of that specific case, it involved a circumstance whereby the contract called for specific conduct. And that's what the Utah Supreme Court spoke to. But, Your Honor, the standard of what constitutes a mailing for the purposes of a presumption in court that a party received and considered and had substantive agreement with those elements is the same throughout these United States. Not if the parties agree to something different. Freedom of contract. You can agree that unless there's a video of the recipient obtaining the letter or the package from the mail, it won't be presumed to have been mailed. I understand the court's point that that case may be factually distinguished because of the presence of that fact. Okay. I would just quickly addressing the mailbox issue. The Winship affidavit is plainly insufficient for two reasons. First of all, they state here that the agreement that was sent is a template agreement, which is quizzical because as was observed by opposing counsel, it is an identical agreement to the one that they admit that they assert is somehow the exact agreement. As the court has correctly noted, it is impossible that these specific documents were the actual agreements because they are missing pages. Also, if the court notices, they are out of order. And most importantly, Mr. Winship has no personal knowledge of what occurred after he sent the, or after the records reflect that  And so under any federal rule, Mr. Winship is not competent to testify from personal knowledge as to what occurred after he sent out those things. Therefore, he says he relies on the business records of these two subsequent step parties. It does not say that, Your Honor. It does not say that he reviewed any business records from these third parties. Isn't it a problem anyway, because he only knows what Bluestem did and he doesn't know, maybe I'm getting it wrong. He only knows what his, I think it's Bluestem. He doesn't know what image or whatever the next one was did when they supposedly sent it out. Yes, Your Honor. That's correct. And if I may remind the court as to what the underlying allegations of this case are, the underlying allegations of this case involve the purchase of junk debt accounts with insufficient documents and the use of affidavits in courts that are conclusory and deceptively worded, such as to imply that they do have the actual documentation. And so as the court honed in, the present status of how these specific affidavits were created were that we already won the motion to dismiss in this case. We're now three and a half years into this case. And this case was discovered because the defendants paid almost 40 million dollars in restitution for allegations concerning deceptive affidavits that were worded in a manner as to create the impression that facts exist where they didn't. What's your best argument then for why we shouldn't send it back for a summary trial? Certainly, Your Honor, because they can't produce better evidence than they have. How do we know that? Because the affidavits present were only created, none of these affidavits have personal knowledge of anything that occurred. All that they were capable of doing is pull up a file, which in my experience has five to ten pages, look at it and then craft this affidavit. And so there's nothing new to be added to the record. They've had their bite at the apple. Business records is an established evidentiary rule. If you couple personal knowledge with the business records affidavit that I reviewed the business records, you look at Exhibit E, which is attached, which is quite lengthy, but it clearly includes the arbitration language. If that was in fact mailed, but Mr. Winship has no competence to testify from personal knowledge that that document was ever mailed. Well, what does he say specifically? Again, the document is crafted as to create the impression that he has knowledge. If you notice, it's, I believe, Paragraph 12. After Mason's application was approved, Bluestem as part of its regular and routine business practice, and then he proceeds to discuss what Bluestem and Pitney Doe's pose. What about Paragraph 13? Add Paragraph 13, Your Honor. And it says the account agreement is included. Is the problem that he can't testify to what impact did from personal knowledge? All he says is conclusively, impact in turn used Pitney Bowes to commingle and sort welcome packets and other bulk mail to optimize postal discounts, then to deposit with the U.S. Postal Service for delivery to Mason. But it doesn't say how he knows that. Exactly, Your Honor.  It has all this form language in the beginning about review of documents. And then he makes these statements later on about what third parties did to create the implication that he has firsthand knowledge from review of the business records of third parties. But he clearly did not have such knowledge and did not review such documents. This is merely part of the pattern and practice of the underlying allegations that led us all here. It's a deceptively worded affidavit. Let's look at, what about Exhibit D? So that's what was, is that what was sent by Bluestem to IMPACT? Yes, Your Honor. How do we know what IMPACT did with it based on looking at Exhibit D? We don't know, Your Honor. The record doesn't provide sufficient facts for what IMPACT would have done with it. I can continue. Are there any other concerns that the Court may have perhaps concerning the name and affidavit? I actually believe that these two affidavits have other internal inconsistencies that further should make a court doubt their veracity. For example, it was asserted and has been asserted that for the Winship affidavit that one of the, one of them is the actual application while the other one is the template. But they're both insufficient and they're identical, which is quizzical. Furthermore, Your Honors, if one were to take a look at the Naman affidavit, Ms. Naman asserts that Exhibits 2 and 3 were exact copies of what were sent. But if you were to examine them, it's very clear that those are drafts or they have all kinds of markings on the outside that demonstrate that they were a template. They were certainly not what was actually sent. And so that incongruity would make one doubt the veracity of Ms. Naman's ultimate conclusions as well. I believe, Your Honor, we addressed the click wrap issue in brief. I do believe that opposing counsel may have attempted to lower the Bayes-Moore standard, which very explicitly says that we need to know what the consumer would have seen on their computer screen. And it says here in the affidavit that the computer screen would have shown him a document that includes both the application and the terms and conditions. And the court correctly honed in that even though this affidavit was drafted to meet the Bayes-Moore standard, they play word games, switching from terms and conditions to saying what governed the account. And I believe, Your Honor, that that's another example for the court to doubt the veracity of this affidavit because they have not provided any document that could possibly have been a document that they saw on their own terms. We're not here to question the veracity of it. We're here to question whether the affidavit is sufficient. Your Honor, there are two questions right there. The one is whether it's sufficient to meet the minimum standards of evidence for the court to consider it. That means, you know, is it derived from personal knowledge? Is the personal knowledge derived from sufficient review of business records? And are those business records regularly kept? But veracity is credibility. We can't determine credibility. That's not our job and not the district court's job. It did. And the district court determined that they were uncredible. And I'm merely asking this court not to overturn the district court's determination. Anything else, counsel? No, Your Honor. Mr. Ramey, you have three minutes. I'd like you to talk about the mailbox rule too, Mr. Ramey. You didn't do it on your direct. Yes, Judge Vinson. Very quickly, if I could clear something up for Judge Rosenbaum. I think if you'll look at the attachment to the Winship Affidavit that attaches the account agreement, there isn't really anything cut off. It's a trifold agreement. So the pages are out of sequence. The sequence is 5, 6, 1, 2, 3, 4. And so if you look at the second page, the third column is actually the fourth page. The first column of the first page is the fifth column. And if you read the agreement that way, the entire agreement appears to be. And that's your direct and specific evidence that's required? I don't know how much more direct and specific evidence you can get of what an agreement is. You could have pages 1, 2, 3, 4, 5, and 6, for example. Well, I guess it could be more clear if it were in order. But I don't know that pages being out of order raises a genuine issue of material fact as to the contents. As to the mailbox rule with Mr. Mason's mailing, this is raised as far as the Naaman Declaration, because Naaman's Declaration is I reviewed the records and it was mailed. Well, you rely on Exhibit D, which is just a one-line cut out of a computer sheet. Well, that's as to the Winship's Declaration as to Mr. Mason. I was comparing it to the Naaman Declaration as to Ms. Burnett. As far as delivery, there is some direct evidence. There's also some circumstantial evidence of Mason's mailing. But Winship's testimony is that he has personal knowledge, as the Senior Vice President, of how these accounts get transmitted. And that it's the regular routine practice for Bluestem to send it to IMPACT, for Pratt and Pitney Bowes to send that to IMPACT, Bluestem to IMPACT to Pitney Bowes, and Pitney Bowes puts it in the mail. That's more than just a guess as to what happened. He has personal knowledge of how this occurs. So this isn't like, for example, the Campos case that gets cited over and over again, where there is really no evidence at all as far as what happens. As I recall the declaration in that case, there wasn't this, I know what these entities do and this is what they do. I don't think the court really needs to reach the mailing issue in Mason. Well, actually, you know, you say you've got circumstantial evidence. He used the cards, so he obviously received the cards. So the issue really is what was enclosed with the cards when it was mailed and how does that fit into your argument? Well, Bishop says this is the document that wasn't closed. Based on our records, I know this was the document that wasn't closed. He could have personal knowledge based on the review of the records. And if the discussion here is what records did he review? Should he have to demonstrate that this is actually in the records? As we alluded to, as the court alluded to in discussion with my friend in opposition, those are questions of veracity and credibility, which this court ordinarily would not resolve. It would send it to the district court to resolve that. And Section 4 of the FAA provides a procedure to do that. Well, how can a district judge do it from an affidavit? The district judge can decide whether or not to draw an inference from the affidavit. And as a fact finder, the district judge would be allowed to do that or... Have to draw the inference in favor of the party opposing your motion. So how's that, you know, how's that going to be a credibility determination? You can't do that. No, Your Honor, what I'm saying is he could draw, for example, the inference from the fact... Let's say there is discussion that Mason's declaration, I'm assuming a hypothetical, that Mason's declaration is not competent to establish what impact in Pitney Bowes did after Davis Tracy. Well, I certainly think the fact that Bluestem hired IMPACT to print the welcome packets that include this document. And IMPACT hired Pitney Bowes to mail to Mr. Mason a copy of the welcome kit that includes this document. I think a fact finder could, even if that's not conclusive, a fact finder could infer that that chain of events happened from the ordinary course of the way people do business with one another. If I hire someone to cut my grass, I can probably, and my grass is short, I can infer that that person cut my grass. Those are the type of inferences we draw every day in our day-to-day lives. I think that a fact finder could draw that inference there to close the loop, for example. Your Honor, we would ask that the court reverse the denial of the motion to compel arbitration. Thank you, counsel. We'll take those cases under submission, stand in recess until tomorrow morning.